## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 09-81532-CIV-HURLEY

WANDA TIRADO,

     Movant,

v.

UNITED STATES OF AMERICA,

     Respondent.

_____/

### <u>REPORT AND RECOMMENDATION</u>

This matter is before the Court upon Wanda Tirado's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Judgment and Sentence. [D.E. 1]. The Honorable Daniel T.K. Hurley referred this case to Magistrate Judge James M. Hopkins for appropriate disposition or report and recommendation of all matters in the case. [D.E. 7]. Following the recusal of Magistrate Judge Hopkins from the case, the matter was reassigned to me. [D.E. 9]. I have carefully considered the Motion and supporting Memorandum, the Government's Response [D.E. 10], Movant's Reply [D.E. 15], and the Court file, and am otherwise fully informed in the premises. Based on my review, I recommend that the Motion be denied.

### *I. Background*

Movant Wanda Tirado ("Movant" or "Tirado"), along with others, was charged with defrauding investors through a fraudulent viatical investment company scheme using a

company called Financial Federated Title and Trust, Inc. ("FinFed").[1]  Movant Tirado, the

fiancée of FinFed in-house counsel Garland Hogan (a co-defendant in the criminal case),

served as FinFed's financial director.  According to the Eleventh Circuit's summary of the

scheme,

> FinFed's falsely promised investors that: (1) their money would
> be used to purchase viatical insurance benefits; (2) investors
> would receive a 42 percent return within 36 months if the
> insured died; (3) a FinFed attorney would ensure that the trust
> and escrow facilities used in handling the investment funds met
> industry standards; (4) each investment was a "guaranteed
> receivable" from an insurance company; (5) each investment
> was protected by a fidelity bond; and (6) a medical overview
> had been performed on each of the insureds whose policies
> were purchased. . . .  Instead of using investors' funds to buy
> insurance benefits, the defendants spent the investors' money on
> real and personal property placed in the names of [others], and
> transferred money to other corporations to purchase properties
> and invest in various businesses. . . .  In all, investors lost over
> $100 million.

*United States v. Arroya*, 112 F. App'x 4 (11th Cir. 2004) (table).[2]  The defendants in the

underlying case also used some of the investors' funds to make monthly "income" payments

to earlier investors.  *See* PSI at ¶ 19.

### A. Charges

A grand jury returned a Third Superseding Indictment on December 13, 2000,

---

[1] A viatical sale involves purchasing a beneficial interest in a life insurance policy of a terminally ill person for a percentage of the face value of the policy.

[2] The opinion corresponding to this table citation may be located on the docket sheet of the underlying criminal case, Case No. 99-8125-CR-HURLEY, D.E. 2277.

charging Tirado and others with various mail-fraud and money-laundering offenses. [Case No. 99-8125, D.E. 1006]. Tirado was charged in Count 15 of the Third Superseding Indictment with conspiracy to launder the proceeds of mail and wire fraud with the intent to promote the carrying on of the unlawful activity, to conceal the nature or ownership of such proceeds, and to engage in monetary transactions in criminally derived property worth more than $10,000, all in violation of 18 U.S.C. § 1956(h). *Id.* at Count 15. In addition, the Third Superseding Indictment contained substantive counts of money laundering against Tirado, alleging that she had laundered the proceeds of mail and wire fraud with the intent to conceal the nature or ownership of such proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). *Id.* at Counts 17, 20, 41, 43.

_____Besides these counts, the Third Superseding Indictment also included a forfeiture count. Among other items that the forfeiture count sought to forfeit was $117 million allegedly representing "property which was involved in [the mail fraud, wire fraud, and money-laundering charges] or is traceable to such property. *Id.* at 44.

### *B. Trial Proceedings*

Tirado and seven other defendants were tried before the Honorable Daniel T. K. Hurley from April 2, 2000, through July 11, 2000. During trial, Tirado testified in her own defense. D.E. 2 at 4.

The jury returned a verdict against Tirado of guilty as to all counts. [Case No. 99-8125, D.E. 1990]. In addition, the jury returned a special verdict of forfeiture, finding that

the $117 million sought in the forfeiture count "constitute[d] property involved in [the Count 15 money-laundering conspiracy charge] . . . and/or . . . property traceable to such property." [Case No. 99-8125, D.E. 1650 at 1]. Tirado was sentenced to 262 months' imprisonment, three-year concurrent terms of supervised release on each count, restitution of $90 million, a special assessment of $500, and forfeiture. [Case No. 99-8125, D.E. 1990].

## *C. Appellate Proceedings*

Following her sentencing, Tirado appealed. The Eleventh Circuit affirmed Tirado's convictions on June 24, 2004. *See United States v. Arroya*, 112 F. App'x 4 (11th Cir. 2004) [Case No. 99-8125, D.E. 2277]. Subsequently, however, on October 3, 2005, the United States Supreme Court granted Tirado's petition for writ of certiorari and remanded her case to the Eleventh Circuit Court of Appeals in light of the decision in *United States v. Booker*, 543 U.S. 220 (2005). On remand, the Eleventh Circuit determined that the Government had not met its burden under *Booker* to show that the district court would not have imposed a lesser sentence had it known that the Sentencing Guidelines were advisory and not mandatory. *See United States v. Arroya*, 213 F. App'x 815, 816 (11th Cir. 2007) [Case No. 99-8125, D.E. 2393]. Consequently, it remanded the case to the district court for re-sentencing. *Id.* On May 4, 2007, the district court held a hearing on remand and re-sentenced Tirado to the same sentence initially imposed. *See* Case No. 99-8125, D.E. 2487.

Tirado, who remains incarcerated, again appealed. The Eleventh Circuit affirmed the

re-sentencing proceedings as to Tirado [Case No. 99-8125, D.E. 2597], and on October 20, 2008, the United States Supreme Court denied her subsequent certiorari petition. *Tirado v. United States*, No. 07-11615, 129 S. Ct. 480 (October 20, 2008).

### D. The Pending Motion Pursuant to 28 U.S.C. § 2255.

Tirado then filed the instant Motion under 28 U.S.C. § 2255 on October 19, 2009. [D.E. 1]. As the Government concedes, the Motion was timely filed within one year of the United States Supreme Court's denial of Tirado's certiorari petition. D.E. 10 at 3. In her Motion Tirado requests an evidentiary hearing on the two grounds of relief asserted in her Motion and supporting memorandum:

> (1)   her conviction and sentence were based on a faulty computation of "proceeds" as defined in *United States v. Santos*, 553 U.S. 507 (2008), and
>
> (2)   she was denied effective assistance of counsel due to her trial counsel's failure to prepare her adequately to testify at trial.

### II. Analysis

**A.   The "Proceeds" Issue**

In relevant part, 18 U.S.C. § 1956(a)(1) makes it a crime for anyone,

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, [to] conduct[] or attempt[] to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –
>
> (A)(i)   with the intent to promote the carrying on of specified unlawful activity; or . . . .

(B)    knowing that the transaction is designed in whole or in part –

    (i)    to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . .

Under this statute, to prevail at trial, the Government must prove that

a charged transaction "in fact involve[d] the proceeds of specified unlawful activity" (the proceeds element), and it also must prove that a defendant knew "that the property involved in" the charged transaction "represent[ed] the proceeds of some form of unlawful activity" (the knowledge element).

*United States v. Santos*, 553 U.S. 507, 511 (2008) (quoting 18 U.S.C. § 1956(a)(1)).

Citing *Santos*, Movant contends that the meaning of "proceeds" under Section 1956(a)(1) includes only profits, not receipts. Movant then argues that the Third Superseding Indictment did not charge, the Government did not adduce proof, and the Court did not instruct the jury regarding whether Movant engaged in transactions involving profits, as opposed to receipts, of unlawful activity. Moreover, Movant continues, the Court's allegedly misplaced reliance on the definition of "proceeds" as including gross receipts also led to sentencing error. Consequently, Movant suggests, her conviction must be overturned and her sentence vacated.

In 2008 the United States Supreme Court addressed the meaning of "proceeds" under 18 U.S.C. § 1956(a)(1) in *Santos*, 553 U.S. 507. Santos had operated an illegal lottery in Indiana. *Id.* at 509. Under Santos's[3] system, when gamblers placed bets, "runners" took a

_____

[3] *See* William Strunk, Jr., & E.B. White, *The Elements of Style* 13 (4th ed. 1999).

commission from the wagers and then handed the remaining money over to "collectors," who delivered it to Santos.  *Id.* at 509.  Santos used the money to pay the salaries of the collectors and to pay off the lottery winners.  *Id.*  Based on these facts, the Supreme Court considered whether "proceeds," as used in 18 U.S.C. § 1956(a)(1), refers to "profits" or to "receipts."

Declaring the term "proceeds" to be ambiguous, Justice Scalia, joined by Justices Souter, Thomas, and Ginsburg, relied on the rule of lenity and imposed on "proceeds" the narrower construction – that of "profits," as opposed to "receipts."  *Santos*, 553 U.S. at 509-24 (Scalia, J.).  Although Justice Stevens concurred in the judgment, he qualified his decision, finding only that in the specific case of gambling activity, "proceeds" means "profits."  *Id.* at 525-26 (Stevens, J., concurring).  As for certain other underlying unlawful activity, significantly, Justice Stevens opined to the contrary: "[T]he legislative history of § 1956 makes it clear that Congress intended the term "proceeds" to include gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales."  *Id.*  In other words, Justice Stevens concluded that for crimes where the legislative history of the money-laundering statute makes clear that Congress intended for it to apply to receipts rather than profits, the law must be so interpreted.  But where the legislative history is silent or otherwise fails to shed light on congressional intent as to whether "proceeds" refers to profits or receipts with respect to a particular underlying crime, the rule

of lenity may require the narrower construction.[4]  *See id.*

The dissenters, led by Justice Alito and joined by Chief Justice Roberts and Justices Kennedy and Breyer, found that the term "proceeds" in Section 1956(a)(1) refers to receipts, not profits.  *See Santos*, 553 U.S. at 531-49 (Alito, J., dissenting).  In so concluding, Justice Alito reasoned that (1) in every federal money-laundering law where the term "proceeds" is defined, "the law specifies that 'proceeds' means 'the total amount brought in[,]'" *id.* at 532; (2) the United Nations Convention Against Transnational Organized Crime also defines "proceeds" as that term is used within the document to refer to "'any property derived from or obtained, directly or indirectly, through the commission of an offence[,]'" *id.* at 533; (3) every one of the fourteen states that have defined the term "proceeds" in their money-laundering statutes has done so "in a way that encompasses gross receipts," *id.* at 534; (4) construing "proceeds" more broadly to reach gross receipts is consistent with the purposes of money-laundering provisions to deter money-laundering and to "prevent[] the use of dirty money to promote [a criminal] enterprise's growth[,]" *id.* at 535-36; and (5) interpreting the term "proceeds" narrowly to include only profits would "immunize[] successful criminal enterprises during those periods when they are operating temporarily in the red" and would

_____

[4]On May 20, 2009, Congress amended 18 U.S.C. § 1956 to eliminate any ambiguity as to the meaning of "proceeds."  The statute now defines "proceeds" to include "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity."  18 U.S.C. § 1956(c)(9) (2009).  Of course, this amendment does not apply to Tirado, as it was enacted after the conduct alleged in the indictment.

cause "pointless and difficult problems of proof."  *Id.* at 537.

1. *Is Tirado Procedurally Barred From Raising the "Proceeds" Issue?*[5]

On direct appeal Tirado did not raise any issues arising out of whether the evidence was insufficient to sustain her conviction because the Government failed to prove that she laundered "proceeds" as *Santos* defines the term (*i.e.*, "profits," as opposed to "receipts"). Because Tirado could have, or, in the Government's view, should have raised such issues on direct appeal, the Government asserts that Tirado's claim in this regard is procedurally barred unless Tirado makes a showing of cause for her procedural default and prejudice from a failure to raise the claim on appeal.  D.E. 6 at 6 (citing *United States v. Frady*, 456 U.S. 152, 167-69 (1982); *McCleskey v. Zant*, 499 U.S. 467, 493 (1991); *Parks v. United States*, 832 F.2d 1244, 1245-46 (11th Cir. 1987)).  As at least some of Tirado's arguments in this regard implicitly invoke constitutional rights, *e.g.*, Tirado's contention that the Third Superseding Indictment was defective (*see* D.E. 2 at 9) and Tirado's suggestion in her Reply brief that counsel's failure to raise the *Santos* "proceeds" argument constituted ineffective assistance of counsel (*see* D.E. 15 at 5-6), the Court considers whether Tirado has made the necessary showing of cause and prejudice.

---

[5]The Government does not suggest that the *Santos* rule does not apply retroactively to a case on collateral review, probably because persuasive Eleventh Circuit decisions clarify that it does.  *See Weeks v. United States*, 382 F. App'x 845, 848-49 (11th Cir. 2010) (citing *King v. Keller*, 372 F. App'x 70, 73-74 (11th Cir. 2010) (*per curiam*); *United States v. Peter*, 310 F.3d 709, 711 (11th Cir. 2002) (*per curiam*)) ("[T]he *Santos* opinion clearly construed a substantive federal criminal statute' by defining the meaning of the term 'proceeds' in § 1956 . . . , [so] *Santos* retroactively appli[es]" to cases on collateral review).

Under *Frady* and its progeny, the cause-and-prejudice standard is "more stringent" than that of "plain error," which applies on direct appeal to issues not raised in the trial court. *Parks*, 832 F.2d at 1245. As the Eleventh Circuit has emphasized, this higher standard "is necessary and proper to further 'society's legitimate interest in the finality of the judgment . . . perfected by the expiration of the time allowed for direct review or by the affirmance of the conviction on appeal.'" *Id.* (quoting *Frady*, 456 U.S. at 164).

As relevant to this case, a movant can satisfy the "cause" requirement by demonstrating that "'some objective factor external to the defense impeded counsel's efforts' to raise the claim" in the direct proceedings. *See McCleskey v. Zant*, 499 U.S. 467, 494 (1990) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Among others, such factors include "'a showing that the factual or legal basis for a claim was not reasonably available to counsel,'"*High v. Head*, 209 F.3d 1257, 1262-63 (11th Cir. 2000) (citing *Murray*, 477 U.S. at 488), or a demonstration of constitutionally ineffective assistance of counsel. *Murray*, 477 U.S. at 488.

With regard to the first factor, although the Supreme Court has noted that a claim that "is so novel that its legal basis is not reasonably available to counsel" may constitute cause for a procedural default, *see Reed v. Ross*, 468 U.S. 1, 16 (1984), the Supreme Court and the circuit courts of appeals, including the Eleventh Circuit, have narrowly construed the standard "reasonably available." Thus, the Eleventh Circuit has recognized that the inquiry under this standard "'is not whether subsequent legal developments have made counsel's

task easier, but whether at the time of the default the claim was "available" at all.'" *McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir. 2001) (quoting *Smith v. Murray*, 477 U.S. 527, 537 (1986) and citing *Waldrop v. Jones*, 77 F.3d 1308, 1315 (11th Cir. 1996)).

For example, in *McCoy*, the Eleventh Circuit considered the movant's § 2255 motion asserting that his sentence violated the dictates of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which had been issued after the *McCoy* movant had been sentenced.[6]  The *McCoy* movant did not file an appeal of his sentence, and the sentence became final on January 20, 1999.  On June 26, 2000, the Supreme Court issued *Apprendi*.  Within four months, the *McCoy* movant filed his § 2255 motion arguing that his sentence was illegal under *Apprendi*.

Among other arguments, the Government contended that the movant had procedurally defaulted his *Apprendi* argument and that he could not establish cause and prejudice for the default.  The Eleventh Circuit agreed, explaining that the movant had the "legal tools to construct the claim before the [*Apprendi*] rule was issued":

> Apprendi himself raised the issue some time before his case was argued to the New Jersey appellate court in February of 1997 . . . , so the building blocks for arguing it were obviously in existence as early as then.  And as the other circuits to address this issue have noted, the foundation for *Apprendi* was laid years before the Supreme Court announced *Apprendi*. *See* [*U.S. v.*] *Sanders*, 247 F.3d [139] at 146 [(4th Cir. 2001)] (stating that "[t]he germ of Sanders' *Apprendi* claim had sprouted at the time of his conviction [in 1997] and there is no reason why he could not have raised it then"); [*U.S. v.*] *Moss*, 252 F.3d [993] at 1001 [(8th Cir. 2001)] (stating that "the argument that drug quantity

---

[6]Under *Apprendi*, each fact that increases the penalty upon conviction beyond the prescribed statutory maximum must be submitted to the jury and proved beyond a reasonable doubt.

is an offense element under § 841(b), not a sentencing factor,
was certainly available to Moss's counsel at the time of Moss's
direct appeal [in 1998]"); *United States v. Smith*, 241 F.3d 546,
548 (7ᵗʰ Cir. 2001) (stating that "the foundation for *Apprendi*
was laid long before 1992"); *Garrott v. United States*, 238 F.3d
903, 905-06 (7ᵗʰ Cir. 2001) (noting that "[o]ther defendants
began making *Apprendi*-like arguments soon after the
Sentencing Guidelines came into being"), *cert. denied*, 532 U.S.
1072 . . . (2001).

266 F.3d at 1258.

Nor did the Eleventh Circuit find convincing the *McCoy* movant's supposition that

asserting what effectively became an *Apprendi* claim prior to the Supreme Court's issuance

of *Apprendi* would have been futile. As the Eleventh Circuit reasoned,

> The fact that every circuit which had addressed the issue had
> rejected the proposition that became the *Apprendi* rule simply
> demonstrates that reasonable defendants and lawyers could well
> have concluded it would be futile to raise the claim. . . . The
> problem with that position is that the Supreme Court could not
> have been clearer that perceived futility does not constitute
> cause to excuse a procedural default. *Bousley* [*v. United
> States*], 523 U.S. [614] at 623 . . . . Unless and until the
> Supreme Court overrules its decisions that futility cannot be
> cause, laments over those decisions forcing defense counsel to
> file "kitchen sink" briefs in order to avoid procedural bars . . .
> are beside the point.

*McCoy*, 266 F.3d at 1258-59.

In view of *Reed* and its progeny, including *McCoy*, Tirado cannot demonstrate cause

for procedurally defaulting her *Santos* claim. As several other courts have recounted, the

"proceeds" argument appeared in the judicial landscape well before the Supreme Court

issued its plurality opinion in *Santos*. *See, e.g.*, *Johal v. United States*, 2009 WL 210709,

-12-

*9 (W.D. Wash. Jan. 28, 2009); *United States v. McCray*, 2010 WL 3171210, *3 (S.D. Cal. Aug. 11, 2010); *Buffin v. United States*, 2010 WL 2802477, *4 (W.D. Mich. July 15, 2010). These courts have noted that the origins of the Supreme Court's plurality decision in *Santos* "can be traced back to 2002 when the Seventh Circuit Court of Appeals held 'the word "proceeds" in § 1956(a)(1) denotes net rather than gross income of an unlawful venture.'" *Johal*, 2009 WL 210709, *9 (citing *United States v. Scialabba*, 282 F.3d 475, 478 (7th Cir. 2002)). Relying on *Scialabba*, the *Santos* district court granted the *Santos* movant § 2255 relief in 2004, and the Seventh Circuit affirmed in 2006. *Id.* (citing *United States v. Santos*, 324 F. Supp. 2d 781, 798-99 (N.D. Ind. 2004), and *Santos v. United States*, 461 F.3d 886, 894 (7th Cir. 2006)).

Movant here was re-sentenced on May 4, 2007, five years after the Seventh Circuit had issued *Scialabba* and a year later than the Seventh Circuit had affirmed the district court's application of *Scialabba* in *Santos*. Thus, it matters not to the cause analysis that the Supreme Court had not yet issued its plurality decision in *Santos* at the time that Movant was re-sentenced in the pending matter. Regardless of the existence of the Supreme Court's *Santos* decision, the *Santos* "proceeds" argument was "reasonably available" to Movant at the time of her re-sentencing in the same way that the Eleventh Circuit found the *Apprendi* rule to have been "reasonably available" to the movant in *McCoy*. As a result, Movant cannot show "cause," and the Court need not consider prejudice.

Moreover, to the extent that Movant suggests that her counsel was ineffective for

failing to raise the *Santos* "proceeds" argument, she likewise cannot demonstrate cause. Although the "proceeds" argument was "reasonably available" at Tirado's re-sentencing, in the Eleventh Circuit at that time, the argument would not have succeeded because binding Eleventh Circuit precedent more broadly defined the term "proceeds." More precisely, in the Eleventh Circuit, "[t]he term 'proceeds' simply represents 'what is produced by or derived from something (as a sale, investment, levy, business) by way of total revenue; the total amount brought in.'" *United States v. Silvestri*, 409 F.3d 1311, 1333 (11ᵗʰ Cir. 2005) (citation omitted). As a result, in the Eleventh Circuit at that time, the word "proceeds" in the money-laundering statute included monies brought in from the scheme, whether profits or not, regardless of the underlying unlawful activity from which the monies were derived. *See also United States v. Panhandle Trading, Inc.*, 2006 WL 2037175, *3 (N.D. Fla. July 18, 2006) (rejecting the defendants' motion to dismiss on the basis of the "proceeds" argument adopted by the *Scialabba* Court because "[t]he Eleventh Circuit . . . interprets 'proceeds' more broadly than the Seventh Circuit as demonstrated in *Silvestri* and the Eleventh Circuit's adoption of the definition of 'proceeds' contained in the U.C.C.").

Because the *Santos* "proceeds" argument "clearly lack[ed] merit" in the Eleventh Circuit before the issuance of *Santos*, counsel could not have been ineffective for failing to raise it. *See Brownlee v. Haley*, 306 F.3d 1043, 1066 (11ᵗʰ Cir. 2002) (finding that counsel was not ineffective for not making arguments that "clearly lack[ed] merit"); *see also Marquard v. Sec'y for the Dep't of Corr.*, 429 F.3d 1278, 1313 (11ᵗʰ Cir. 2005) (quoting

*Spaziano v. Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994) (*Marquard* Court's quotation marks omitted) ("We have held many times that '[r]easonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop.'"). Thus, Tirado's claim exists in a sort of legal limbo where it simultaneously was novel enough to justify counsel's non-raising of the issue yet sufficiently "reasonably available" so as not to provide "cause" for Tirado's failure to make the argument. *See Buffin*, 2010 WL 2802477, *4 (citation omitted).

Nevertheless, this circumstance does not end the inquiry. The Court may still consider Movant's *Santos* claim if a decision not to do so would result in a "fundamental miscarriage of justice." *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1179-80 (11th Cir. 2010) (quoting *Muhammad v. Sec'y, Dep't of Corr.*, 554 F.3d 949, 957 (11th Cir. 2009)). A "fundamental miscarriage of justice" occurs only in "'an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent.'" *Id.* at 1180 (quoting *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). Because Movant's contention that she is actually innocent depends on whether *Santos* requires the conclusion that the plurality's definition of "proceeds" applies to conduct alleged in the underlying case here, the Court next undertakes that inquiry.

2. *The Meaning of "Proceeds" Under 18 U.S.C. § 1956(a)(1)(A) in the Eleventh Circuit in the Aftermath of* United States v. Santos*, 553 U.S. 507 (2008)*

The Eleventh Circuit has had occasion to consider the contours of the *Santos* plurality since the Supreme Court issued the judgment two years ago. In *United States v. Demarest*,

the Eleventh Circuit concluded,

> *Santos* has limited precedential value. Three parts of Justice Scalia's four-part opinion are for a plurality of justices, and those parts do not state a rule for this case. *See Santos*, 128 S. Ct. at 2022-45. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" *Marks v. United States*, 430 U.S. 188, 193 . . . (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15 . . . (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). **The narrow holding in *Santos*, at most, was that the gross receipts of an unlicensed gambling operation were not "proceeds"** under section 1956, but there is no evidence that the funds Demarest laundered were gross receipts of an illegal gambling operation.

570 F.3d 1232 (11th Cir. 2009) (emphasis added).  Since issuing *Demarest*, the Eleventh

Circuit has repeatedly reaffirmed its limitation of *Santos*'s holding to cases involving illegal

gambling organizations. *See, e.g., United States v. Jennings*, 599 F.3d 1241, 1252 (11th Cir.

2010); *King v. Keller*, 372 F. App'x 70, 73 (11th Cir. 2010);[7] *United States v. Hein*, ___ F.

App'x ___, 2010 WL 3549952, *4 (11th Cir. Sept. 14, 2010).  In fact, the Eleventh Circuit

has specifically applied the teachings of *Demarest* to uphold the broader construction of

"proceeds" to include gross receipts in the context of a money-laundering case where the

specified unlawful activity involved a Ponzi-type[8] fraud scheme as in the case at hand. *See*

---

[7] The Eleventh Circuit did not elect to publish this decision.  Consequently, under Rule 36-2, 11th Cir., the opinion does not constitute binding authority.  Nevertheless, it may be cited as persuasive authority.  *See* 11th Cir. R. 36-2.

[8] "Generically, a Ponzi scheme is a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting

-16-

*King*, 372 F. App'x at 73.  As the Eleventh Circuit has explained, "This court has previously defined proceeds as 'what is produced by or derived from something . . . by way of total revenue; the total amount brought in.' . . .  This definition includes receipts as well as profits.  This definition binds the court . . . ." *Jennings*, 599 F.3d at 1252.  In short, Eleventh Circuit precedent precludes the conclusion that Tirado urges, and no error occurred where the indictment, the Government's proof, the jury instructions, and the sentencing all relied on the broader definition of "proceeds."

Nor, as Movant suggests, does *Moreland v. United States*, ___ U.S. ___, 129 S. Ct. 997 (2009), require, or even suggest, otherwise.  In *Moreland*, in a three-sentence memorandum order, the United States Supreme Court vacated a Ninth Circuit decision affirming the defendant's convictions for mail fraud, wire fraud, money laundering, and conspiracy to effect these same objects in connection with the defendant's participation in a Ponzi-type scheme and remanded for reconsideration in light of *Santos*, without any explanation.[9]  *See id.*; *see also United States v. Moreland*, 509 F.3d 1201 (9th Cir. 2007).  Because *Moreland* did not involve money-laundering relating to an illegal gambling organization and the Supreme Court nonetheless remanded it for further consideration in

_____

more investors."  *United States v. Silvestri*, 409 F.3d 1311, 1317 n.6 (11th Cir. 2005) (quotation omitted).

[9]In its entirety, the order reads, "On petition for writ of certiorari to the United States Court of Appeals for the Ninth Circuit.  Motion of petitioner for leave to proceed *in forma pauperis* and petition for writ of certiorari granted.  Judgment vacated, and case remanded to the United States Court of Appeals for the Ninth Circuit for further consideration in light of [*Santos*]."  *Moreland*, 129 S. Ct. 997.

light of *Santos*, Tirado construes *Moreland* as evidence that *Santos* applies to money-laundering cases involving all types of specified unlawful activity, not just illegal gambling.

The problem with Movant's position stems from the fact that it attaches too much significance to the Supreme Court's remand order.  Orders such as the memorandum order that the Supreme Court issued in *Moreland* are called "GVR" orders, referring to the granting of certiorari, the vacating of the judgment below, and the remanding of the case. *See Lawrence v. Chater*, 516 U.S. 163, 165 (1996).  The Supreme Court has held that 28 U.S.C. § 2106 confers on the Supreme Court the power to issue such orders.  *Id.* at 166. Among other reasons, the Supreme Court issues GVR orders when it determines that doing so may "assist[] the court below by flagging a particular issue that it does not appear to have fully considered" or when the Supreme Court believes that it would benefit from the lower court's insight before the Supreme Court rules on the merits.  *Id.*  Significantly, the Supreme Court has recognized,

> "Naturally, because GVR orders are premised on matters that we have reason to believe the court below did not fully consider, and because they require only further consideration, the standard that we apply in deciding whether to GVR is somewhat more liberal than the All Writs Act standard, under which relief is granted only upon a showing that a grant of certiorari and eventual reversal are probable."

*Id.* at 168 (quoting *Heckler v. Lopez*, 463 U.S. 1328 (1983) (Rehnquist, J., in chambers)). Put simply, the fact that the Supreme Court GVRs a case does not act as some type of shorthand that the Supreme Court has ruled on the merits of the case and reversed the lower

court's ruling, and a GVR order cannot fairly be construed as a reversal or even a signal to reverse on the merits.

In turning to *Moreland*, the Court notes that the Ninth Circuit's original decision in *Moreland* that the Supreme Court vacated and remanded did not consider or address the meaning of "proceeds." *See Moreland*, 509 F.3d 1201. Subsequently, *Santos* was issued, and, invoking the decision, the *Moreland* defendant raised the issue of the meaning of "proceeds" in his petition for certiorari. *See* Brief for Petitioner at 1 *Moreland v. United States*, 129 S. Ct. 997 (2009) (No. 08-5878), 2008 WL 5535367 at *1. Thus, the Supreme Court's GVR order suggests no more than the Supreme Court's recognition that the Ninth Circuit did not have the opportunity to consider in the first instance the issue that Moreland raised in his certiorari petition, that is, whether *Santos* might have had an effect on the Ninth Circuit's decision in *Moreland*.

Although the Ninth Circuit ultimately concluded that *Santos* required "proceeds" to refer to profits in *Moreland*, *see Moreland v. United States*, 622 F.3d 1147, 1166 (9th Cir. 2010), the Ninth Circuit's decision does not reveal that the United States Supreme Court necessarily would have reached the same conclusion. Indeed, as discussed above, in another money-laundering case where the specified unlawful activity consisted of a Ponzi fraud scheme, the Eleventh Circuit reached the opposite determination – that is, the Eleventh Circuit held that *Santos* did not require the word "proceeds" in the money-laundering statute to refer to profits. *See King*, 372 F. App'x at 73. In this regard, the Eleventh Circuit

unambiguously stated, "We have interpreted *Santos* to apply **only** to money laundering schemes involving an illegal gambling organization." *Id.* (citing *Demarest*, 570 F.3d at 1242) (emphasis added).

This Court further notes that the Eleventh Circuit issued *Demarest* and its progeny after the Supreme Court remanded *Moreland*, so the *Moreland* GVR order was not outside the Eleventh Circuit's purview when it rendered the rulings in these subsequent cases. For all of these reasons, the controlling law of this Circuit forecloses Tirado's claim, and, as a result, Tirado likewise cannot demonstrate actual innocence.

Finally, contrary to Tirado's suggestion, the Eleventh Circuit's construction of the *Santos* "proceeds" rule does not create an impermissible merger situation in this case. First, as previously discussed, the Eleventh Circuit has declined to apply the *Santos* rule in the context of a money-laundering case where the predicate offense involved mail and wire fraud, and specifically, a Ponzi scheme.

Second, independent consideration of the merger issue does not suggest that it conflicts with the Eleventh Circuit's holding in this regard. As Tirado notes, all of the opinions in *Santos* discuss the issue of merger, although they disagree of the implications of the doctrine. Justice Scalia explained the problem as he viewed it in the context of *Santos*'s facts:

> If "proceeds" meant "receipts," nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to

promote the carrying on of the lottery.  Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. § 1955, would "merge" with the money-laundering statute.  Congress evidently decided that lottery operators ordinarily deserve up to 5 years of imprisonment, § 1955(a), but as a result of merger they would face an additional 20 years. . . .

*Santos*, 553 U.S. at 515-16.

A Ponzi scheme charged under the mail and wire fraud statutes such as in the pending matter does not present the same problem because unlike in a lottery scheme, a mail or wire fraud scheme need not necessarily reinvest funds obtained from victims to promote the scheme further.  And Ponzi schemes like the one involved in the underlying case here represent a special category of mail-and-wire-fraud cases.  In order to commit garden-variety basic mail or wire fraud, one need not necessarily use funds acquired from later victims of the fraud to pay off earlier victims of the fraud.  Indeed, the Federal Reporters contain abundant cases of mail and wire fraud that involve no such payments of later victims' funds to earlier victims.  Similarly, a mail or wire fraud operation need not provide incentives to the sales people in the scheme to victimize more individuals, such as commissions like those paid to Tirado and other sales people in this case effectively were.[10]

Under the separation of powers, only Congress enjoys the "power to 'define a crime . . . and ordain its punishment.'" *United States v. Wright*, 607 F.3d 708, 719 (11th Cir. 2010) (citation omitted).  Ponzi schemes frequently enlist their victims, who, at the time do not

---

[10]Movant does not suggest – and the law does not provide any support for the proposition – that concealment money-laundering may suffer from the merger problem.

realize that they are being victimized, to recruit other victims, a characteristic that Congress could have permissibly taken into account in determining punishment.  And paying sales people by commission likewise increases the probability of a greater victim universe. Similarly, Congress could have permissibly concluded that individuals who use some of the monies that they obtain through mail or wire fraud to commit additional mail or wire fraud and perpetuate the scheme in order to victimize more individuals should be subject to different punishment than those who commit a one-shot basic fraud and then cease their criminal enterprise.

Thus, it fell within congressional prerogative to choose to punish separately from the underlying mail or wire fraud, the use of funds acquired through the mail or wire fraud scheme to further perpetuate the scheme, thereby subjecting to additional punishment, for example, the sub-categories of mail and wire frauds that include Ponzi schemes and commission-based fraud operations.  In short, the money-laundering conspiracy of which Movant was convicted does not merge with the underlying specified unlawful activity in this case – mail and wire fraud.  As a result, application of the Eleventh Circuit's construction of "proceeds" after *Santos* does not create an impermissible merger problem, and Tirado's first claim should be denied.

**B.**     **Ineffective Assistance of Counsel**

Tirado further contends that her conviction and sentence should be vacated, set aside, or corrected because she did not receive effective assistance of counsel at trial, in violation

of the Sixth Amendment.  D.E. 2 at 17.  Specifically, Tirado claims that counsel performed

deficiently in failing to advise and prepare Tirado adequately to testify at trial.  D.E. 2 at 18.

Tirado did not raise this argument on direct appeal, but that failure does not prevent review

here in her § 2255 motion.  *See Massaro v. United States*, 538 U.S. 500 (2003).

Under the test for ineffective assistance of counsel established by *Strickland v.

Washington*, a successful claimant must establish two factors: (1) her attorney's

representation fell below an objective standard of reasonableness under prevailing

professional norms, and (2) her lawyer's deficient performance prejudiced her defense.  466

U.S. 668, 687, 694 (1984).  With regard to the first prong, "courts must 'indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional

assistance; that is, the defendant must overcome the presumption that, under the

circumstances, the challenged action might be considered sound trial strategy.'" *Reed v.

Sec'y, Fla. Dep't of Corr.*, 593 F.3d 1217, 1240, *cert. denied*, ___ U.S. ___, 131 S. Ct. 177

(2010).  In other words, a movant must demonstrate that "no competent counsel would have

taken the action that [her] counsel did take."  *Chandler v. United States*, 582 F.3d 1305,

1315 (11th Cir. 2008) (*en banc*) (citation omitted).  Moreover, "'strategic choices made after

less than complete investigation are reasonable precisely to the extent that reasonable

professional judgments support the limitations on investigation.'" *Reed*, 593 F.3d at 1240

(quoting *Strickland*, 466 U.S. at 690-91).

As for the prejudice inquiry, prejudice occurs where a reasonable probability exists

that, but for counsel's deficient performance, the result would have been different. *Strickland*, 466 U.S. at 694.  A court deciding an ineffective-assistance-of-counsel claim need not address both the deficient performance and prejudice prongs of the inquiry if a movant has made an insufficient showing on one prong.  *Id.* at 697.

Here, Tirado alleges,

> Trial counsel failed to prepare Ms. Tirado for her testimony, resulting in the jury getting the mistaken impression that Ms. Tirado, who could not recall all of her earnings, was dishonest, and therefore that she must have been involved in money laundering on behalf of the Ponzi scheme.  Counsel had anticipated, correctly, that Ms. Tirado's reported income, and the taxes she paid on that income, would be a subject of inquiry. As such, he advised her to see an accountant and file an amended tax return.  However, counsel failed to properly supervise Ms. Tirado's preparation of amended returns. Further, in preparing his client to testify, he never uncovered that the supposedly error-free, amended returns contained an error in that they failed to show that Ms. Tirado earned approximately $40,000.00 in income from referrals she received from an interior decorator.

D.E. 2 at 18-20.  For purposes of this analysis, the Court assumes without finding that trial counsel did not supervise the amended return preparation and that he failed to discover that the amended returns incorrectly did not include $40,000.00 in income that Movant had received from Steven G. Interiors.  Despite these assumptions, Tirado's complaints cannot establish a successful ineffective-assistance-of-counsel claim.

Nothing about these aspects of trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms.  First, as Tirado concedes,

-24-

trial counsel correctly anticipated that Tirado's original false tax returns would become an issue during cross-examination. Therefore, he, in conjunction with two accountants, further made a strategic decision to advise Tirado to file corrected tax returns. *See* Case No. 99-8125, Trial Transcript ("TT") at 8734 (Tirado's testimony that her decision to file an amended tax return after the criminal trial began "was based on the professional opinion of two accountants, [and] my lawyer . . . ."). This was certainly a reasonable strategy, and Tirado does not suggest otherwise.

In order to execute this particular strategy, trial counsel referred Movant to an accountant to prepare the actual tax returns. As issues relating to tax matters can benefit from a specialized base of knowledge that attorneys specializing in non-tax criminal defense may not have, enlisting the services of an accountant to prepare the amended tax returns and relying on the accountant's expertise in completing the returns fell well within the standards of reasonableness under prevailing professional norms. Moreover, Movant has not suggested what else counsel should have done in order to "properly supervise" the accountant's preparation of the tax returns. Counsel has similarly failed to identify any procedures counsel should have followed or steps he should have taken in order to discover that the amended returns omitted the $40,000 in income that Tirado had received from Steven G. Nor can this Court discern any. As a result, Tirado cannot satisfy the first prong of *Strickland*.

While the Court need not consider the second prong, the Court nonetheless notes that

Movant cannot establish prejudice, either.  In this regard, Tirado's position fails at two different levels.  First, it is significant that Tirado herself testified that when she met with the accountant who prepared her amended tax returns, he had obtained a transcript of all of the information that the Internal Revenue Service ("IRS") had in its computer regarding Tirado's income during the relevant years.  TT at 8810-11.  She further noted that he had reviewed the transcript with her and that it did not include the income that Movant had received from Steven G. Interiors.  *Id.*  Moreover, when cross-examined on the stand about monies paid to her by Steven G. Interiors, Tirado initially denied receiving such payment until the Government confronted her with evidence of it.  *See id.* at 8770.  Under these circumstances, the Court is at a loss to determine how additional supervision of the attorney's amended return preparation would have resulted in error-free returns or how his further preparation of Tirado for her testimony would have reasonably been expected to uncover the missing income.  Consequently, even had trial counsel engaged in additional supervision of Tirado's filing of her amended returns or in more testimony preparation, no reasonable probability exists that the error would have been caught.

Second, on a grander scale, even had counsel discovered and corrected the error prior to Tirado's filing of the amended tax returns, the Court does not find it reasonably probable that such a fact would have altered the outcome of the trial.  While Tirado urges the Court to conclude that it was solely this testimony that caused the jury to conclude that she had lied, Tirado herself admitted significant prior untruths on the stand.  Among others, for

example, Tirado conceded that her original 1998 tax return "did not include all [her] income." TT at 8801.  Indeed, it omitted the hundreds of thousands of dollars that Tirado had received from FinFed, as well as other income.  *See id.* at 8768, 8807.  Tirado also confessed on the stand that she had lied on an affidavit that she had previously submitted to the IRS, even though she signed it under penalty of perjury.  *Id.* at 8806.  Thus, Tirado effectively was in the position of saying to the jury, "I know I lied under oath and got caught before, when less was at stake, but now I really am telling the truth this time."  Under these circumstances, the Court cannot find a reasonable probability that the jury would have arrived at a different conclusion with regard to Tirado's truthfulness or her convictions in the absence of the $41,000 omission on the amended tax returns.

Furthermore, other evidence adduced at trial reflected on Movant's truthfulness, as well as on her intent.  As the Eleventh Circuit noted,

> Tirado controlled FinFed's financial records and was in the best position to know of the fraud.  Moreover, she was directly involved in the fraud by using FinFed funds for her own benefit.  Because of Tirado's role at FinFed, she was in position to know that the company purchased few viatical policies.  Scott Page even told Tirado that FinFed's investor files lacked documents necessary to collect on policies, and that there was no indication that Brandau had purchased policies.  Furthermore, Tirado could not explain FinFed's investment management procedures to Page.
>
> The strongest evidence against Tirado includes the financial transactions that she conducted, which were designed to conceal the receipt and spending of investors' money.  Tirado sent FinFed funds directly to car dealers to buy cars for Brandau and Balsam.  She distributed FinFed funds to Juan Arroyo, her

brother, and Luis Cruz, her cousin.  Tirado sent a $256,000 check to her brother, which she did not include in the company records given to the government, and she even sent a FinFed check to Luis Cruz for over $200,000, and falsely categorized it as a company expense.  These funds were used to pay Tirado's credit card bills and to purchase real estate for her and her parents.  In addition, she wired $180,000 from the Bahamas to her brother's account to purchase a house.  Finally, Tirado admits failing to report much of her income to the IRS.  Although the government did not charge her with that crime here, this was further evidence of her intent to conceal the proceeds of the fraud.

*Arroya*, 112 F. App'x 4 [Case No. 99-8125, D.E. 2277].  Thus, even if Tirado could show that her trial counsel's representation unreasonably fell below professional norms – which she cannot – her claim would fail for lack of prejudice because it is not reasonably probable that Tirado would not have been convicted had the $41,000 in income appeared on her amended tax returns.

Tirado's citation to the Court of *McCann v. United States*, 528 F. Supp. 2d 4 (D. Mass. 2008), does not alter the analysis.  In *McCann*, the movant alleged that trial counsel had been ineffective for not allowing a defendant to testify.  Prior to the trial in *McCann*, the lawyer and McCann had discussed the possibility that McCann might testify and had made a tactical decision that he would not.  *Id.* at 6.  After the government closed its case, however, McCann said, in effect, "I must testify," although ultimately, McCann did not testify.  *Id.*  In his habeas corpus petition, McCann asserted that he had communicated his desire to testify but was prevented from doing so by his attorney.  *Id.*  The court denied the claim.  *Id.*  In so doing, in *dicta*, the court opined, "To change course and put [p]etitioner on

-28-

the stand to testify with no preparation might itself have constituted ineffective assistance of counsel." *Id.* at 7. Based on this statement, Tirado suggests that she received ineffective assistance of counsel.

Even setting aside the fact that Tirado relies on *dicta* from an out-of-circuit case, the instant matter does not involve a situation where trial counsel allowed Movant to testify without any preparation whatsoever. To the contrary, Tirado concedes that counsel engaged in testimony preparation activities and even arranged for Tirado to file amended tax returns as part of the strategy to attempt to portray Tirado and her testimony in the most favorable light. For the reasons previously discussed, counsel's activities in these regards does not satisfy *Strickland*'s ineffective assistance standard.

## C. Evidentiary Hearing Not Necessary

Finally, the Court notes that Tirado requested an evidentiary hearing on her § 2255 motion. Section 2255(b) provides that a court shall hold an evidentiary hearing "[u]nless the motion and the files of the case conclusively show that the [movant] is entitled to no relief." Here, the Tirado's Motion and the record in the underlying case do not necessitate a hearing. With regard to Tirado's *Santos* "proceeds" claim, the issue is a legal one, the resolution of which cannot be affected by an evidentiary hearing. *See Smith v. United States*, 431 F.2d 1 (8th Cir. 1970) (holding that an evidentiary hearing was not required when the issues raised were mainly legal issues and the facts were adequately set forth in the pleadings).

As for Tirado's ineffective assistance claim, to be granted an evidentiary hearing, Tirado must have made allegations that, if true, would entitle her to relief.  *Tejada v. Dugger*, 941 F.2d 1551 (11th Cir. 1991).   For the reasons previously discussed, she has not done that.  Since the pleadings and files of the case conclusively demonstrate that Movant is entitled to no relief, the request for a hearing is denied.

### *Conclusion and Recommendation*

For the foregoing reasons, I respectfully recommend that the Court **DENY** Movant's Motion [D.E. 1].  The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Daniel T.K. Hurley, United States District Judge.   Failure to file objections timely shall bar the parties from a *de novo* determination by the district judge of an issue covered in the report and shall bar the parties from attacking on appeal the factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (*en banc*);[11] 28 U.S.C. § 636(b)(1).

**FILED AND SUBMITTED** at Fort Lauderdale, Florida, this 3rd day of December 2010.

ROBIN S. ROSENBAUM
UNITED STATES MAGISTRATE JUDGE

cc:    Hon. Daniel T.K. Hurley

---

[11]Decisions rendered by Unit B of the former Fifth Circuit constitute binding precedent in the Eleventh Circuit.  *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

Counsel of Record